# 𝔎𝔦𝔠𝔥𝔪𝔬𝔫𝔡

## J. H. FULLER v. MAE FITCHETT TROY.

January 13, 1938.

Present, Campbell, C. J., and Holt, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Gilbert L. Diggs,* for the appellant.

*W. M. Minter,* for the appellee.

BROWNING, J., delivered the opinion of the court.

The bone of contention in this case is the location of a boundary line between coterminous landowners, who are the parties litigant. They will be referred to hereafter as plaintiff and defendant, the positions they occupied in the trial court.

The plaintiff and two of her ancestors, who were all members of the same family, have owned the land upon which the plaintiff resided at the time of this suit since the year 1874.

The defendant purchased the adjoining tract of land, upon which he has resided, in the year 1926. It is stated in the record, and not traversed, that there has never been any controversy between the owners of the two respective tracts of land as to the boundary line in question until the defendant became the purchaser of the tract which he now owns. Since that time the line has been the subject of a greater or lesser degree of disputation.

Mary C. Fitchett, who was the immediate predecessor in title of the plaintiff, before any civil litigation began between the respective owners of the land, instigated, through the Commonwealth's attorney of Mathews county, an action against the defendant for trespass upon her land and upon the county road, in which he was convicted and required to pay a fine. Sometime subsequently trouble between them broke out afresh, resulting in a suit in chancery by Mary C. Fitchett against the defendant based upon her complaint of continued acts of trespass upon her land by the defendant. The result of this suit was a decree entered by consent of the parties through their counsel, who are the respective counsel in this suit, fixing the disputed line in accordance with a plat filed with the bill and made by G. T. Hudgins, surveyor.

The language of the decree fixes the northern terminus of the Fitchett-Fuller line at "low water mark on Milford Haven." This, we gather from the whole record, was rather inartificial, in that it is subject to two variant constructions. Milford Haven is a body of water with a contour of embankment which is irregular and tortuous. Here the tides ebb and flow and by accretions, natural or by human agency, lands may be formed and exist where water once was. This is the legend of the northern portion of the Fitchett Troy land which bordered on Milford Haven. The northern terminus of the Fuller land, at the point where it

joins the Fitchett Troy land, also touches Milford Haven at the border line of a cove which was the approximate low water line as given on certain old plats, which latter form the basis of the plat made by direction of the court in the suit in judgment. The fact that this indentation of water is called a cove makes it none the less a part of what is and was known as Milford Haven. Clustered around this fact is the confusion, as we see it, that has crept into this case.

The defendant contends that the low water mark on Milford Haven, mentioned in the consent decree referred to, is the point north and west of the cove which is the northern terminus of a straight line projected to the water. If such contention is the true one then the defendant would acquire a wharf, which was constructed 50 years ago by W. E. Fitchett, a predecessor in title of the plaintiff, and also land within the Fitchett boundary which was made by accretions and filling in and upon which Fitchett erected and operated a tomato factory and other buildings which he constructed thereon more than 40 years ago. This portion of the plaintiff's property comprises her most valuable water front, affording a steamboat wharf and a productive oyster shore. This fact makes it almost inconceivable that Mrs. Fitchett and her counsel would have consented to the entry of a decree by which she would be deprived of these valuable property rights, when the purpose of the suit was to prevent the depredations and trespassings of the defendant and quiet her possession of her lands.

The defendant contends that the decree in the former suit fixed the boundary line so that his contentions obtained. This being by consent and in the form of a decree constitutes a former adjudication of the issues and is conclusive of the matter in dispute and a bar to the plea of the plaintiff made by her bill of complaint. He cites cases decided by this court holding that judgments and decrees, especially when they are entered by consent, are contracts of the highest character and cannot be disturbed except for certain causes. This is sound as a general statement of the law made in

relation to the facts present in those cases but it is not controlling in this case.

In Barton's Pleading and Practice, page 447, this is said: "A consent decree partakes of the nature of both a contract and a decree sanctioned by the court. It is binding, however, only upon the consenting parties and not on them if procured by fraud or mistake."

In the case of *Gregg* v. *Sloan,* 76 Va. 497, this was said: "If we may look outside of the decree to extrinsic testimony as evidence of consent, we find it very unsatisfactory. Evidently Mr. Thompkins (counsel for the trustee at that time) and Judge Lybrook (Mrs. Gregg's counsel) did not have the same understanding of the matter. This is manifest from the statements they make, and a decree so palpably unjust ought not to be permitted to stand on mere consent unless such consent be established by the clearest and most convincing proof."

The meaning and effect of the consent decree is brought into question for the first time in the suit in judgment and it is at once revealed that, viewing it as a contract, the minds of the parties have never met. They are entirely at antipodes concerning its meaning.

Counsel for the plaintiff states in her brief that after the entrance of the consent decree in the former case the defendant desisted from further trespass upon that portion of the plaintiff's land upon which he had depredated, but sometime later began trespassing upon the land to the north, which we have heretofore referred to, which brought about the present suit. It was at this time that her counsel was apprised of the defendant's contention as to the line established by the consent decree.

The trial court heard evidence upon the bill of complaint and upon the plea and answer of the defendant and the replication of the plaintiff and after certain witnesses, who testified for the plaintiff and the defendant, were heard the court declined to hear further evidence and overruled the plea of the defendant and decided the case upon its merits in favor of the plaintiff.

Before the preparation of the decree putting into effect the decision of the court it directed that the services of a competent surveyor should be secured to make a plat or map showing the true boundary line between the lands of the parties and also the surrounding lands and the contention of the defendant. This was done and the plat made by Carlton B. Hudgins, certified surveyor, coincides with the contention of the plaintiff. This plat was based upon the plats made by surveyors G. T. Hudgins and R. F. Haywood, who were both witnesses in the immediate case, the former testifying in behalf of the plaintiff and the latter for the defendant. The plat was considered as a part of the evidence in the case and, in effect, was made a part of the decree. It fixed, by recital, the boundary line between the plaintiff and defendant as that shown on the plat referred to, with the recital that it is the same line that was established by the former consent decree of the 19th day of January, 1934, and which was understood to be established by it by both of the parties to this suit.

The decree contains, in part, the following language: " * * * and that it was never the intent of the court or the understanding of either plaintiff or defendant that the court, by its decree entered on the 19th day of January, 1934, extended the line of J. H. Fuller over and across the high land and the wharf now belonging to Mae Fitchett Troy to low water mark to the east of said wharf in Milford Haven, etc. * * *"

There was ample evidence in the case in judgment to justify the decree. The court heard the witnesses. The chancellor, a man of recognized ability, rare legal acumen and unimpeachable character, who lived near the lands, knew the parties and was of necessity familiar with the conditions, has decided the case. The conclusions are plainly right, there is abundant evidence to sustain them, and we affirm the decree.

*Affirmed.*